## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                           )
**ELLEN F. GROSS,**                        )
                                           )
     PLAINTIFF,   )
                                           )
  **v.**                          )  **Civil Action No. 1:12-CV-1531**
                                           )
**LOGISTICS SUPPORT, INC.**,               )
                                           )
    DEFENDANT.          )
_____)

## DEFENDANT LOGISTICS SUPPORT, INC.'S MOTION FOR SUMMARY JUDGMENT

  COMES NOW Defendant Logistics Support, Inc., by counsel, and pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and to this Court's Order dated April 30, 2013, and respectfully requests entry of summary judgment in its favor as to all claims asserted in this suit by Plaintiff Ellen Gross. There is no genuine dispute as to any material fact as to any of the claims or defenses in this matter, and Defendant is entitled to entry of judgment in its favor as a matter of law. In support of its Motion, Defendant provides the Court with its Memorandum in Support of Defendant's Motion for Summary Judgment and, pursuant to Rule 7(h)(1) of the Local Rules of the United States District Court for the District of Columbia, its Statement of Undisputed Material Facts.

May 17, 2013       **LOGISTICS SUPPORT, INC.**
            By Counsel:


          _____**/s/ James A. Allen**_____
          James A. Allen (DC Bar # 443595)
          GENERAL COUNSEL, P.C.
          6862 Elm Street, Suite 800
          McLean, Virginia 22101
          Phone: (703) 556-0411
          Facsimile: (703) 556-6540
          jallen@GCPC.com
          Counsel of Record for Logistics Support, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**ELLEN F. GROSS,**                         )
                                                    )
             PLAINTIFF,         )
                                                    )
        **v.**                         )       **Civil Action No. 1:12-CV-1531**
                                                    )
**LOGISTICS SUPPORT, INC**.,              )
                                                    )
           DEFENDANT.       )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LOGISTICS SUPPORT, INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Logistics Support, Inc., by counsel, in support of its Motion for Summary Judgment, and in addition to its accompanying Statement of Undisputed Material Facts, submits the following Memorandum of Points and Authorities:

**I.**        **INTRODUCTION**

Plaintiff Ellen Gross (herein "Plaintiff") brought the instant action again Defendant Logistics Support, Inc. (herein "LSI"), alleging a single cause of action under Title VII of the Federal  Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Amendments of 1977, 42 U.S. C. §§ 2000e, et seq. ("the Pregnancy Discrimination Act").  As discussed more fully below, Plaintiff has produced absolutely no evidence to support her assertions.

Plaintiff was formerly employed as a Human Resources Manager for LSI, but her employment, simultaneously with the employment of two other individuals, was terminated on June 22, 2011, as a reduction in force of LSI's administrative staff.  In conducting its deliberations, LSI identified that Plaintiff was redundant to other company personnel, and it had objective reasons to select Plaintiff for termination.  While Plaintiff was pregnant at the time of her termination, her pregnancy was immaterial to her termination.

Following the completion of discovery in this litigation by the parties, Plaintiff has been

unable to produce, or even identify, any evidence which would support her claims against LSI.

The mere fact that a plaintiff is pregnant at the time of her termination does not create a triable

issue of fact on a pregnancy discrimination claim, and, as such, entry of summary judgment in

Defendant's favor is proper.

## II.   FACTUAL BACKGROUND

*Defendant Logistics Support, Inc.*

Defendant Logistics Support, Inc. ("LSI") is a small-business defense contractor that

specializes in providing logistics support services to the U.S. military. (Compton Dep. 19:7-22 –

20:1-11).  LSI's founder and Chief Executive Officer, David Compton, established the company

in 2001. *Id.* Along with Compton, LSI's other executive officers are Steve MacDonald (COO),

Joe Sciacca (CFO), and Vicky Williamson (Senior Vice President). (Compton Dep. 24:9-13).

These four individuals comprise LSI's executive team, and are, under Compton's ultimate

decision-making authority, responsible for overseeing and directing LSI's operations. *Id.*

As a government contractor, LSI's business involves obtaining and performing under

contracts and task orders that are awarded by the Department of Defense, Coast Guard, and

Army. An important part of LSI's business is its ability to effectively hire new personnel in a

timely manner, in order to staff any work awarded to LSI under the contracts it has won. LSI

therefore considers recruiting to be of primary importance to its business model. (Compton Dep.

190:14-16) (stating that recruiting "has to be on the top of [LSI's] priority list. That's what we're

all about, trying to bring people in.").   Successfully recruiting qualified employees into empty

positions is an immediate way to increase cash flow and profitability, as well as to increase client

satisfaction.  As a result of LSI's frequently changing staffing needs, LSI's total number of

employees can vary significantly depending upon the number of contracts and task orders it is

performing under at a given time, and fluctuations in LSI's total workforce were a standard part of LSI's business. (Gross Dep. 312:10-15).

The vast majority of these employees are "billable" – that is, they are employed to perform work under specific task orders that have been awarded to LSI by the Government client, and their salaries are directly funded under the contract. A small number of LSI's employees are considered to be overhead or General & Administrative ("G&A") employees. (Compton Dep. 34:7-19). The G&A employees perform certain necessary administrative functions for the company, and consist primarily of LSI's executive personnel, its accounting department, its human resources department, and its contract administrators. (Compton Dep. 77:2-12). Although some G&A employees can and do perform billable work under specific contracts, G&A employees do not perform exclusively under the task orders that have been issued to LSI. (Compton Dep. 23:17-20).

*Plaintiff's Employment with LSI*

In LSI's first few years of operation, the company's Human Resources ("HR") functions were performed in part by its own part-time employee, and in part by Paychex, a company that performs outsourced HR functions on behalf of businesses. (Compton Dep. 40:1-21). From 2002 through 2004, Plaintiff was employed by Paychex and assigned as a Human Resource Representative with Paychex to provide HR services to LSI. *Id.* Through her role as LSI's Paychex HR representative, Plaintiff became familiar with LSI's business as well as with several LSI employees, including Compton. *Id.*

In or around January of 2010, LSI decided, as part of a series of cost-reduction initiatives it was implementing, that it would take its HR function in-house and no longer use Paychex to handle its HR needs. (LSI's Answers to Interrogatories, No. 8). Because LSI's existing part-time HR employee was unwilling to increase her hours and was unable to take on all of LSI's HR

needs, the company had a need for a part-time HR employee.  During this same period of time,

Plaintiff was on maternity leave from Paychex, having given birth to her first child on October

23, 2009.  While on maternity leave, Plaintiff determined she did not wish to return to full-time

work at Paychex. (Gross Dep. 34:17-22 – 35:1-22).  As Paychex only had full-time HR positions

available, Plaintiff began searching for an alternative employment position, and contacted

Defendant to inquire if they had any need for a part-time HR employee. (Gross Dep. 35:1-22).

　　LSI hired Plaintiff in January 2010 as its HR Manager. Plaintiff requested, and LSI

agreed, that Plaintiff would be employed as a part-time employee, working three days a week.

(Gross Dep. 39:18-20); (Gross' Responses to Requests for Admission, No. 23).  At the time that

she was hired, Plaintiff made it clear to LSI that she only wished to be employed in a part-time

capacity in order to have more time to take care of her growing family. (Gross' Responses to

Requests for Admission, No. 24); (Gross Dep. 34:17-20).  Plaintiff also made it clear she was

unwilling to travel as part of her job duties for LSI. (Compton Dep. 81:1-3).

　　Plaintiff's job duties at LSI consisted of administering the company's employee benefits

programs, acting as LSI's liaison and contact point for employees with questions or difficulties

regarding the administration of Defendant's employment benefits, and maintaining employee

records. (Compton Dep. 46:14-22).  As HR Manager, Plaintiff's job duties also included

recruiting for LSI, and ensuring that LSI had enough personnel to staff its contracts. (MacDonald

44:11-15); (Gross Dep. 44:12-22 – 45:1-3; 82:9-11).  As part of these duties, Plaintiff

implemented and maintained LSI's HR automation software, and also processed new hire

paperwork. (Compton Dep. 46:14-22 – 47:1-10).  Plaintiff also provided resumes of employment

candidates to hiring managers, and scheduled and performed screening interviews for candidates.

(Compton Dep. 192:5-19; 174:1-8).  Although Plaintiff was also responsible for LSI's

recruitment efforts, Plaintiff did not actively pursue recruitment of new personnel, such as by

sourcing employees to perform under contract awards, by recruiting employees from the predecessor contractors that had previously performed on contracts awarded to LSI, or by travelling to contract locations to find and interview personnel. (Compton Dep. 47:11-22).  As such, throughout 2010, LSI's employee recruitment activities needed to be augmented by an independent contractor named Pam Richardson. (Compton Dep. 48:1-15).  Richardson was a recruiting specialist who provided recruitment support for LSI, particularly with regards to hard to fill positions. (Compton Dep. 51:19-22 – 52:1).

Plaintiff generally performed to satisfaction as LSI's HR Manager, and met expectations in managing LSI's HR functions. (Compton Dep. 52:15-17).  However, although Plaintiff adequately performed the requirements of an HR employee, she was less capable at performing the duties of a recruiter.  As discussed herein, LSI had ongoing concerns about Plaintiff's ability to recruit and staff LSI's contracts. LSI did have some concerns regarding Plaintiff's "frequent" absenteeism. (MacDonald Dep. 196:16); (Compton Dep. 52:18-20).  Plaintiff often did not come to work, requested permission to work from home, or requested changes in her schedule. (*Id.*); (Gross Dep. Ex. 28).  LSI was accommodating to Plaintiff, however, and allowed her to take time off every time she requested. *Id.*  If leave was necessary due to Plaintiff's child being sick, her supervisors were understanding, and would grant her request for leave by noting "[w]elcome to parenthood. Take care of the little one. The world will continue to spin," "[do] [w]hatever you are most comfortable with," "[r]elax[,] take care of family," and "[y]our call, Ellen. I know you don't like bringing [your daughter] in." (Gross Dep. Ex. 28, pgs. 1, 2, 7, and 8).  Although Plaintiff has referred to herself as a "top performer" throughout this litigation, Plaintiff acknowledged that LSI never used that term to refer to her, but rather that "top performer" was a term that Plaintiff herself used to describe her own performance. (Gross Dep. 21:14-18). However, and to be clear, LSI did not terminate Plaintiff poor performance.

Throughout the entirety of her employment with LSI, Plaintiff made her intention to have additional children well-known among her coworkers. (MacDonald Dep. 208:12-22).  Early in 2011, Plaintiff informed LSI employees, including her supervisor, that she and her husband had decided to try to have a second child. (Gross Dep. 167:5-10).  Plaintiff did in fact become pregnant in early 2011, and at the conclusion of her first trimester, on or around June 6, 2011, Plaintiff announced to her co-workers at LSI, including to LSI's executive team, that she was expecting her second child.  Plaintiff received rounds of congratulations from her coworkers on the pregnancy (Gross Dep. 24:3-4; 166:17-21; 167:20-21).  At no point did any of Plaintiff's coworkers or supervisors tell Plaintiff that her pregnancy could in any fashion impact her work at LSI, or be a work-related problem in any way. (Gross Dep. 168:5-22 – 169:1-18).

<u>LSI's Decision to Hire a Recruiter</u>

When Plaintiff was first hired by LSI, she "met with the executive team to do a comprehensive HR assessment to find out what the company needed," and "based on the priority that the executive team had given [Plaintiff], … the first priority was for recruiting." (Gross Dep. 44:18-20, 45:1-3). *See also* (Gross Dep. 111:4-6) (stating that recruiting "was the basic, first, most important priority that was communicated to [Plaintiff]" by LSI's executive team). However, Plaintiff's supervisor, MacDonald, often had to counsel Plaintiff on her recruiting efforts, and it became apparent to LSI that recruiting "wasn't [Plaintiff's] major forte." (Compton Dep. 161:14-17).  In the entire time that Plaintiff was employed by LSI, Plaintiff only hired or recruited "between 30 and 40 people." (Gross Dep. 103:15-19).  Plaintiff was not enthusiastic about her recruiting duties, and "[Plaintiff] never characterized herself as a recruiter.  She was very clear about that." (MacDonald 42:4-6).  Plaintiff's method of recruiting did not involve actively sourcing for new candidates, but rather consisted of entering the position into Taleo, an applicant tracking system, which would then automatically post the job listing to free job listing

sites. (Meyer Dep. 52:2-4); (Gross Dep. 76:11-20).  Plaintiff had been familiar with Taleo

through her employment with Paychex, who was the owner of the software, and it was Plaintiff

that recommended LSI's purchase of the software when she was hired. (Gross Dep. 75:14-20;

45:11-13).

Plaintiff's method of recruiting was to "open[] [a] requisition within Taleo. Candidates

would apply," and Plaintiff would "put them in [her] yes/no/maybe pile and forward[] to the

hiring manager the resumes." (Gross Dep. 94:22 – 95:1-3).  Gross did not typically use any other

methods in order to recruit employees for LSI. (Gross Dep. 95:10-17).  Plaintiff never contacted

military employment centers in order to find candidates (Gross Dep. 237:21-22), nor did she ever

recruit employees from a predecessor contractor on a government contract that LSI had been

awarded. (Gross Dep. 126:13-16).  Plaintiff's recruiting efforts at LSI did not include actively

contacting potential candidates, or seeking out candidates who might have special qualifications

needed by LSI. (Gross' Responses to Interrogatories, No. 5).

Particularly in the government contracting industry, "recruiting is not just tak[ing] a

resume or interviewing somebody," (Compton Dep. 161:14-17), and "if you look at what real

recruiters do, [Plaintiff] f[ell] short in that area." (Compton Dep. 161:20-22).  Plaintiff's

supervisor had to speak with her about the difficulties that her Taleo-based recruiting method

was causing, as "a lot of times the resumes [Plaintiff] would provide [LSI] didn't meet the

qualifications that [LSI] w[as] looking for. … [T]he implication was that she was just pulling

resumes off the net and forwarding them without reviewing them, making sure they meet the

requirement." (MacDonald Dep. 42:17-22). *See also* (Gross Dep. 226:12-13; Ex. 35) (e-mail

from MacDonald to Plaintiff regarding potential candidates she had submitted, stating "Ellen, the

last three you forwarded don't cut it [in my opinion].").

In short, Plaintiff's recruiting efforts "did[] [not] yield good results," (MacDonald Dep. 42:13), as her recruiting process "required lots of input from hiring managers[;] … essentially hiring managers were doing all the work that a recruiter would normally do." (MacDonald Dep. 41:6-9). As a result, even though Plaintiff had been responsible for all of LSI's recruiting needs when she was initially hired, LSI found that "there was an additional need" for recruiting and that a recruiter would need to be hired. (Gross Dep. 65:9).

*Kathy Meyer's Employment with LSI*

Kathy Meyer[1] is LSI's current Director of Human Resources. (Meyer Dep. 102:15). She is an HR professional with thirteen years of experience in the field, as well as substantial experience as a professional recruiter. (Meyer Dep. 15:5-7). She holds a Masters degree in Human Resources Management. *Id.*

Prior to joining LSI, Meyer was an HR Manager for Paychex, where she had been for approximately 9 years. (Meyer Dep. 20:4-12). While employed with Paychex, she and Plaintiff were coworkers for several years, and the two had a personal friendship in addition to their longstanding professional relationship. (Gross Dep. 72:7-14). After Plaintiff left Paychex and joined LSI, Meyer continued to work for Paychex for several years, holding the title of HR Manager. (Meyer Dep. 23:10-17). Like Plaintiff, for a period of time while Meyer was employed by Paychex she was also assigned as LSI's Paychex representative. Plaintiff, in evaluating Meyer's level of HR experience, describes it as equivalent to her own, stating that "[w]e basically have, I would say, similar experience. We were at jobs for similar amounts of time." (Gross Dep. 108:8-10). However, unlike Plaintiff, Meyer also had several years of experience in professional recruiting. (Meyer Dep. 16:13 – 20:3).

---

[1] When Meyer was hired at LSI, her legal name was Kathleen Meyer. After joining the company, she was married, and her name is now Kathleen Martin. Although some of the documents and exhibits cited to in the record may refer to her as Ms. Martin, for the sake of clarity she has been referred to as Kathy Meyer or Ms. Meyer throughout this brief.

Although Meyer did not become employed by LSI until 2011, she had some prior familiarity with LSI's business.  In or around September of 2007, while still employed by Paychex, Meyer had in fact interviewed with LSI for the position of full-time HR Manager – the same position ultimately held by Plaintiff (in a part-time capacity), and the position that is the subject of Plaintiff's discrimination claim. (Meyer Dep. 33:2-22).  LSI was impressed by Meyer when she initially interviewed in 2007, and offered her the HR Manager position at that time. *Id.* Meyer did not accept the offer, however, and she remained at her existing position with Paychex. *Id.*

In and around December 2010 and January 2011, LSI made the decision that it needed to hire a full-time recruiter, as Plaintiff was unable to meet all of LSI's recruiting needs. (Gross Dep. 65:2-5) ("Logistics Support needed to hire an additional person because they needed someone who would focus on bringing on individuals needed for the contract."); (MacDonald Dep. 44:17-21 – 45:4-21) (stating that "one of the primary reasons Meyer was hired was to focus on recruiting, because it was something that, again, self-admittedly, [Plaintiff] did not like doing. And [Plaintiff] felt [] that Meyer … was a better fill for that position than she was.").  Plaintiff sent an e-mail to Meyer alerting her to the available recruiter position.  Meyer, who had several years of dedicated recruiting experience (Meyer Dep. 17:7 – 19:19), applied for the recruiting role, and was ultimately hired by LSI as its full-time recruiter with an annual salary of $90,000.00. (Gross Dep. 186:15-16).  Although Meyer earned more than Plaintiff because she worked full-time, Meyer was not paid at a higher hourly rate than was Plaintiff. (Gross' Responses to Requests for Admission, No. 23).

After starting with LSI in March 2011, Meyer began recruiting for several LSI contracts that were in desperate need of personnel.  After joining LSI, Meyer quickly proved herself to be a capable recruiter, with "[o]utstanding recruiting skills." (Compton Dep. 71:12-15; 201:1);

(MacDonald Dep. 91:1-19).  Meyer was "very successful" in using her variety of networks to identify and recruit new employees, and LSI was very pleased with her performance. (Compton Dep. 162:20-22).  Meyer also used numerous methods to carry out her recruiting duties, including "going to different locations to find applicants, …military resources, unemployment offices, schools, forums, blogs, LinkedIn, [and] Internet," (Meyer Dep. 52:15-18), and she tailored her candidate sourcing based on the particular position for which she was recruiting. (Meyer Dep. 54:11-14) (describing how Meyer "was trying to find folks with a nursing background, so [Meyer] went to nursing schools in San Antonio, Texas[.]").  Meyer also contacted organizations that were likely to know of candidates with particular skill-sets, such as the Department of Veterans Affairs, Fleet and Family Services organizations at military bases, and recruiting agencies (Meyer Dep. 53:1-16).  Meyer's recruiting efforts have enabled LSI to fully perform on several contracts that were in danger of being understaffed. In fact, in June 2012, LSI awarded Meyer with a bonus for her efforts in successfully recruiting over a 70 employees in a single month. (Meyer Dep. 47:17-21).   Successful recruiting is critical to the financial success of LSI, and Meyer was successful in her recruiting efforts.

From March 2011 through June 2011, Meyer also frequently performed general HR duties on behalf of LSI. (Meyer Dep. Ex. 15, 16); (Gross Dep. Ex. 25, 31, 32, 33).  On days that Plaintiff was not working, Meyer handled any HR duties that arose. *Id.*  Meyer proved more than capable at handling LSI's benefits system and in acting as a liaison for LSI employees with questions about HR matters. (Meyer Dep. 94:8-11).  On days that Plaintiff was in the office, Plaintiff and Meyer collaborated and worked closely together in managing LSI's HR affairs, and Meyer was thoroughly aware of and involved in the company's HR operations. (Compton Dep. 202:14-18); (MacDonald Dep. 198:13-18).  At no point has LSI had any complaints or concerns regarding Meyer's performance of Human Resources-related tasks, or any other tasks, and in fact

has been very pleased with her performance at both HR duties and with recruiting. (MacDonald

Dep. 197:6-8).

<u>*Cost-Reduction Initiatives*</u>

During the 2009 calendar year, LSI lost two major contracts that it had previously been

performing under. (LSI's Answers to Interrogatories, No. 8).  The effect of these losses was

significant, and resulted in LSI's billable work force being reduced by approximately 100

individuals. *Id.*  Because of the loss of these important contracts, LSI was forced to implement a

series of ongoing cost containment strategies. *Id.*  The preliminary measures, implemented in

2009, consisted of hiring a full-time, in-house CFO (Joe Sciacca), in order to replace a very

expensive "outside" CFO consultant; eliminating discretionary year-end management bonuses;

and freezing pay increases for management unless an increase was allowed, and directly billable

under a specific contract. *Id.*

In 2010, LSI continued to address cost issues, and the company's overall revenue was

down. (MacDonald Dep. 106:17-18).  As a result, during 2010 LSI undertook further cost cutting

measures. In order to reduce operating expenses, LSI took steps to, among other measures:

eliminate the on-site parking benefit it had previously provided to employees (Gross' Responses

to Requests for Admission No. 16); change cellular carriers and office copiers (LSI's Answers to

Interrogatories, No. 8); reduce the hours of on-site IT support person from full-time to part-time

(*Id.*); in-source its payroll processing functions (*Id.*); in-source its corporate tax preparation (*Id.*);

sub-lease excess office space in its main office (*Id.*); and begin the process of relocating its office

from Washington, D.C. to a lower cost area. *Id.*  LSI's decision to leave its office in D.C. and

obtain new office space in Arlington, Virginia was directly motivated by LSI's efforts to reduce

its operating expenses (Gross' Responses to Requests for Admission, No. 12), and, although

LSI's move was not completed until the second half of 2011, the process began well before Plaintiff's termination.

Despite LSI's efforts to reduce costs, as of 2011 the company's financial situation still had not recovered from the contract losses that occurred in 2009, or from the lackluster year in 2010. (MacDonald Dep. 106:10-19).  In its first quarter of 2011, LSI failed to meet its revenue benchmarks, and opportunities in its business development pipeline were taking longer to be awarded. (Compton Dep. 141:9-15).  Even where LSI was able to win contracts, due to both the economy and due to various political developments those contracts often failed to generate any task orders, resulting in those contracts failing to produce any revenue for LSI at all. (Compton Dep. 139:20-22 – 140:1-4; 154:2-5).  As a result, reducing costs and increasing business development were the executive team's two core concerns at the time of LSI's April 2011 executive team meeting. (Compton Dep. 29:14-22 – 30:1-4; 158:8-11).

LSI routinely convenes meetings where LSI's entire executive team meets in a single location to engage in strategic planning regarding LSI's business operations.  During their planning sessions in April 2011, the executive team updated LSI's Strategic Plan by adding a new action item: "A-1: Conduct a Staffing Review – Determine infrastructure support requirements by 2nd Quarter CY11." (LSI's Answers to Interrogatories, No. 7).  As a starting point for this action item, Compton created a document titled "2011 - 2015 Strategic Hires/BD approach," for use in ongoing discussions with other executive team members. (Compton Dep. Ex. 4).  This document reflected the executive team's options for downsizing its G&A personnel, in order to offset the costs of its new business development and strategic hiring initiatives. *Id.* (identifying "[p]otential [o]ffsets" for new business development initiatives).

Although specific personnel changes were not made at that time, the April 2011 planning sessions were the genesis of LSI's decision to carry out a strategic reduction in force of its G&A

personnel. (LSI's Answers to Interrogatories, No. 7).  By reducing its overhead staffing costs, LSI could free up cash flow that would allow it to hire personnel who would be able to increase the company's business development capacity. (Compton Dep. Ex. 5). These changes were thoughtfully designed to generate revenue and win contracts.  LSI's executive team agreed, however, that LSI would refrain undertaking any personnel actions until after the first quarter CY-2011 operating results were completed. (LSI's Answers to Interrogatories, No. 7); (Compton Dep. Ex. 17, at pg. 4).

Following the April 2011 strategy sessions, LSI's executive team engaged in ongoing discussions about how to implement LSI's plans for business development, and what cost-cutting measures LSI would undertake in order to pay for these business development initiatives.  As a part of that process, the executive team created a document titled "LSI Strategic Plan." (Produced by LSI in discovery, at LSI 04-269).  The LSI Strategic Plan outlined LSI's plans for business development and revitalized growth, and identifying the following goals for achieving certain business objectives:

- "[r]eview OH/G&A expenses for cost reasonableness, possible cost savings and future planning";
- "[e]stablish a strategic element under 'reduce costs' to pursue this year";
- "[c]ontinue to consider corporate HR requirements"; and
- "[d]etermine when additional accounting support is required, consider alternatives and cross training to add depth."

(LSI 04-269, at pgs. 3, 4, 7).

In strategy sessions in April of 2011 (and prior to Plaintiff's pregnancy announcement), LSI's executive team had identified a list of eight G&A employees that were under consideration for termination as part of LSI's ongoing cost-cutting measures. (Compton Dep. Ex. 4).  Both Plaintiff and Meyer were identified on this list; next to Plaintiff's name was an additional notation, stating "can't afford 2 HRs." (Compton Dep. Ex. 4).  Over a period of three months following the April 2011 meetings, the executive team carefully considered various approaches

for implementing this reduction in force. LSI's goal in conducting the layoffs was to consolidate the existing G&A job duties, reduce the total number of G&A employees, and then distribute the G&A work among the remaining personnel. (MacDonald Dep. 86:5-22 – 87:1-15).  In order to minimize disruptions or reductions in its administrative capabilities as a result of the layoffs, LSI's decision-making process was focused on identifying redundancies in the skill-sets of its employees, and determining where overlaps existed in the job descriptions of its current staff. (MacDonald Dep. 86:5-10).

*Reduction In Force*

Ultimately, of the eight employees identified by the "2011 - 2015 Strategic Hires/BD Approach" document as potential candidates for termination, three employees, including Plaintiff, were terminated. (Compton Dep. Ex. 2).  LSI carried out these terminations on the morning of June 22, 2011. (Compton Dep. Ex. 2).   In all, one employee from each G&A department was let go; in addition to Plaintiff, an employee in the accounting department and an employee responsible for contract administration were also terminated.  None of the terminations were "for cause," but rather were strategic layoffs based on a number of different considerations, stemming from the need to reduce overhead costs.  (Compton Dep. 180:20-22) (stating that Plaintiff's termination was "not performance-based," but instead "was [due to] cost.").  Although LSI considered many factors in conducting its reduction in force, ultimately LSI's decision to retain Meyer as its HR Manager was based on the fact that Meyer was "a fully qualified HR person and she could do the job of [HR Manager]," and that she also "had the key skill of recruiting that [LSI] needed." (Compton Dep. 202:14-18).  In addition, Meyer could work 5 days instead of 3, and was able to travel for work.  Plaintiff's pregnancy was not a factor in any degree in LSI's decision to terminate Plaintiff's employment. (MacDonald Dep. 209:5-8).

The accounting department employee who was terminated had her accounts payable duties taken over by LSI's office manager (Compton Dep. 102:16-19); the contract administrator's duties were taken over by another contract administrator. (Compton Dep. 101:11-18); and Plaintiff's HR duties were assumed by Meyer. (Compton Dep. Ex. 17, at pg. 4). Although all of the job duties previously performed by the terminated personnel would be absorbed by the remaining G&A support staff, the remaining employees were not provided any associated increase in pay, despite the expansion of their employment duties. (LSI's Answers to Interrogatories, No. 7).  Through the end of 2011, no additional G&A staff were hired to perform the functions of the personnel terminated on June 22, 2011.

On June 22, 2011, LSI informed the three affected employees that they were being terminated as a reduction in force, and provided each of them with a Separation Agreement for their review.  That morning, Plaintiff met privately with Compton and MacDonald, who informed her that she was being terminated as a reduction in force.  LSI never indicated to Plaintiff that her pregnancy was in any way a factor in the decision to terminate her employment. (Gross' Responses to Requests for Admission, No. 1).  At the meeting with Compton and MacDonald, it was explained to Plaintiff that LSI "had decided to make some cutbacks in G&A staff to reduce costs, and that [Plaintiff] was going to be one of several people that [LSI] had to let go that day," (MacDonald Dep. 111:9-13), and that it had been "determined that the skill sets of Kathy [Meyer] [were] what [LSI] needed to retain in the company." (Compton Dep. 180:5-7).

Plaintiff left LSI's offices immediately after being informed of her termination (MacDonald Dep. 112:11-16), even though she was not requested to leave LSI's offices that day. (MacDonald Dep. 119:12-13).  Plaintiff did not speak to anyone on her way out or provide any turnover support to her colleagues regarding the matters she had been handling prior to her termination. (MacDonald Dep. 119:14-16).  Although Plaintiff did not sign the Separation

Agreement, LSI provided Plaintiff with a severance payment of $3,588.00, which Plaintiff accepted.  Plaintiff did not return the severance payment despite filing suit against LSI as a result of her termination.

Following the reduction in force that occurred in June 2011, LSI's business operations continued with little or no disruption.  Meyer became the HR Manager for LSI, and she was responsible for overseeing and conducting all of LSI's HR and recruiting functions.  Meyer successfully performed these duties for LSI following Gross' termination, and continues to be employed by LSI today as the director of HR and recruiting.

*Plaintiff's Lawsuit Against LSI*

After being terminated as a part of LSI's downsizing of its G&A personnel, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that LSI had unlawfully discriminated against her because of her pregnancy.  After the EEOC issued Plaintiff a right to sue notice, she filed suit 18 months later against LSI for violation of the Pregnancy Discrimination Act.

Plaintiff's claim of discrimination is not based on any affirmative evidence that LSI's actions were motivated by a discriminatory intent, but rather on the mere fact that she was pregnant, and that within a month of informing LSI of her pregnancy she was terminated. (Gross Dep. 187:13-19) ("Q: Are you aware of any evidence that supports your belief that your pregnancy was … the reason you got fired?" "A: I don't have any specific evidence, other than the fact that I communicated I was pregnant and three weeks later I was terminated.").  It is important to note however (and as was discussed above), that Plaintiff's name was already on the list of potential terminations beginning in April 2011, well before she announced her pregnancy in June 2011.

In discovery responses provided during the course of the present litigation, Plaintiff has provided a similar description of the total sum of the evidence she relies on to support her claim that, in terminating Plaintiff's employment, LSI discriminated against Plaintiff due to her pregnancy:

> Logistics Support terminated me shortly after I announced my pregnancy. I announced my pregnancy on May 30, 2011, and Logistics Support terminated me on June 22, 2011. From my perspective, as an experienced HR Manager, my termination was not a normal layoff and was discriminatory. I have conducted layoffs before, and know that when a layoff is conducted, the first employees to be laid off are typically those who are recent hires, less experienced, are receiving more money, and/or have performance issues. I had been at Logistics Support for longer than Ms. Meyer, was more experienced, was receiving a lower salary, and had no performance issues.

(Gross' Answers to Interrogatories, No. 10). Plaintiff gave a similar response when asked to describe the complete factual basis for her allegation that "Ms. Gross' employment would have continued in the District of Columbia[2] but for the unlawful employment practice committed by Logistics Support." (Plaintiff's Complaint, at Para. 12). Plaintiff stated that:

> I was given a pay increase of 24.5%[3] on February 1, 2011, based on my performance. I did not have any performance issues. Given my background in Human Resources, I know that when a layoff is conducted, the first employees to be laid off are typically those who are recent hires, are less experienced, are receiving more money, and/or have performance issues. I had been at Logistics Support for longer than Ms. Meyer, was more experienced, was receiving a lower salary, and had no performance issues. As a result, I believe my employment should have continued but for Defendant's illegal employment practice. Additionally, Logistics Supports' suggestion that it was having financial difficulties seems

---

[2] Shortly after Plaintiff's termination, LSI moved its office from Washington, D.C. and into Arlington, Virginia, in order to reduce operating costs. This process began well before Plaintiff was terminated, and Plaintiff was aware of LSI's intent to move as part of its cost-cutting efforts.

[3] In a Supplemental Interrogatory Responses served by Plaintiff on April 24, 2013, Plaintiff changed her answer regarding the amount of her raise. Although her response to Interrogatory No. 3 was not amended, she did provide an amended response to another interrogatory in which she states that the actual amount of her raise was 16.43%.

> false given the 24.5 pay increase they gave me, the fact pay
> increases were not frozen, Holiday bonuses and merit increases
> were given to employees.

(Gross' Answers to Interrogatories, No. 3).  Although Plaintiff amended her interrogatory responses at the conclusion of discovery in this case, Plaintiff did not amend her responses to Interrogatories Nos. 3 or 10, nor did Plaintiff indicate the existence of any additional facts, beyond what is alleged above, that support her allegations of pregnancy discrimination. Accordingly, Plaintiff has – at most – shown a *prima facie* case, with no actual evidence to carry her evidentiary burden of demonstrating that LSI's explanations for its actions are merely pretextual.

### III.    <u>STANDARD OF REVIEW</u>

The legal standard for Summary Judgment in cases involving claims of workplace discrimination is well understood.  This Court, in fact, has repeated this legal standard in several opinions it has written in the recent past, which will be restated here.  *See Parker-Darby v. Dept. of Homeland Sec.*, 869 F.Supp.2d 17 (D.D.C. 2012); *Butler v. Sebelius*, 842 F.Supp.2d 273 (D.D.C. 2012); *Bailey v. WMATA*, 810 F.Supp.2d 295 (D.D.C. 2011).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "Material fact[s]" are those facts that are capable of affecting the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505; *Holcomb*, 433 F.3d at 895.  In evaluating a motion for summary judgment, the court must determine whether any alleged disputes over the factual record are "genuine," such that reasonable jury could accept the non-movant's factual account and, in doing so, return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S.

372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct.

2505; *Holcomb*, 433 F.3d at 895. Importantly, "[a] party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.Pro. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the

nonmovant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

*Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *see also Mastro v. PEPCO*, 447 F.3d 843, 850

(D.C. Cir. 2006); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir.1998) (en banc). On a

motion for summary judgment, courts must "eschew making credibility determinations or

weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

In doing so, the non-movant's evidence "must consist of more than mere unsupported

allegations or denials and must be supported by affidavits, declarations, or other competent

evidence, setting forth specific facts showing that there is a genuine issue for trial." *Blocker-*

*Burnette v. Dist. of Columbia*, 842 F. Supp. 2d 329, 333 (D.D.C. 2012) (*citing* Fed.R.Civ.Pro.

56(e); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant is required to

provide evidence that would permit a reasonable jury to find in its favor. *Laningham v. Navy*,

813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or

"not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at

249–50, 106 S.Ct. 2505.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U .S.C. § 2000e–2(a). "This statutory text establishes

two elements for an employment discrimination case: (i) the plaintiff suffered an adverse

employment action (ii) because of the employee's race, color, religion sex or national origin ...."

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "[W]here the plaintiff

lacks direct evidence of discrimination," courts have traditionally followed the three-step

"burden-shifting approach" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973), to determine whether the second element has been satisfied.

*Chappell–Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006).  If "an employer has asserted a

legitimate, nondiscriminatory reason" for its employment decision, however, this Circuit has

eschewed focusing on the *McDonnell Douglas* prima facie case inquiry in favor of a more

streamlined approach:

> [I]n considering an employer's motion for summary judgment or
> judgment as a matter of law in those circumstances, the district
> court must resolve one central question: Has the employee
> produced sufficient evidence for a reasonable jury to find that the
> employer's asserted non-discriminatory reason was not the actual
> reason and that the employer intentionally discriminated against
> the employee on the basis of race, color, religion, sex, or national
> origin?

*Brady*, 520 F.3d at 494.  In evaluating a motion for summary judgment, the court follows *Brady*

and its progeny in determining, with regard to the alleged incident of discrimination, first

whether the *Brady* prerequisites – that is, Plaintiff's assertion of a *prima facie* case, and LSI's

assertion of a nondiscriminatory explanation – have been satisfied, and then, if so, whether

Plaintiff has produced sufficient evidence for a reasonable jury to find that LSI's asserted reason

for her termination was pretextual and that LSI in fact discriminated against her.

## IV.   <u>ARGUMENT</u>

The law on employment discrimination cases such as this is well-settled.  Once a plaintiff

has made a prima facie showing, and the Employer has proffered a legitimate, non-

discriminatory rationale for the subject employment action, the court will consider one central

question:

> Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee … ?

*Brady*, 520 F.3d at 494.

For purposes of this Motion for Summary Judgment, Defendant is willing to concede that Plaintiff has made a prima facie showing of her claim – that she was pregnant; that she was qualified for the position; that she was affected by an adverse employment action; and that the employment action occurred under circumstances that give rise to an inference of discrimination. *See Gleklen v. Democratic Congressional Campaign Committee, Inc.*, 38 F.Supp.2d 18 (D.D.C. 1999).  In fact, in this case, LSI did not file a Motion to Dismiss, but rather decided to allow the case to proceed to the Summary Judgment stage.  As discussed in detail below, now that discovery in this matter has been completed, it is clear that Plaintiff will be unable to sustain her legal burden, and therefore Summary Judgment should be entered in favor of LSI.

### A.  **LSI Had a Legitimate Non-Discriminatory Reason for Terminating Plaintiff**

As described above, LSI had a legitimate, non-discriminatory reason for terminating Plaintiff, along with two other employees who were also terminated on the very same day, and for the very same reasons.  LSI had, in its best business judgment, identified a business need to reduce its overhead and G&A costs.  The executive leadership of LSI considered several different options to reduce overhead and G&A costs, and in fact ended up implementing various measures to achieve this goal.  These measures included moving its office space, which was a significant and complicated process.  Another measure was terminating the employment of three employees whose functions could be assumed by other overhead employees, with minimal disruption to LSI's business, and minimal reduction in LSI's capabilities.  With respect to the

decision to terminate employees, LSI considered eight different people for termination, and ultimately decided on three, including Plaintiff.

LSI's COO, Steve MacDonald, testified in his deposition that Plaintiff's pregnancy was not a factor in any degree in the decision to terminate Plaintiff's employment.  (MacDonald Dep. 209:5-8).  Instead, as described herein, the ultimate decision for LSI came down to retaining either Meyer or Plaintiff.  LSI considered various factors and issues, and made the informed business decision that it was better for LSI to retain Meyer and terminate Plaintiff.

**B.  There is Absolutely No Evidence of Discrimination**

1.  Plaintiff has produced no direct evidence of discrimination by LSI

The Plaintiff has produced no direct evidence in this case that indicates that she was terminated due to her pregnancy.  LSI asked Plaintiff, in discovery, to identify any evidence that supports her assertion of discrimination, but Plaintiff has not produced any such evidence – because it does not exist.  "Moreover, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party."  *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

In fact, Plaintiff was asked the direct question in her deposition:

> Q:     Are you aware of any evidence that supports your belief that your pregnancy was a – the reason you got fired?
>
> [Plaintiff's counsel objected to the form of the question]
>
> A:     I don't have any specific evidence, other than the fact that I communicated I was pregnant and three weeks later I was terminated.

(Gross Dep. 187:13-19).

Plaintiff's reliance upon temporal proximity, which comprised part of her *prima facie* case, is misplaced.  Temporal Proximity is not evidence, and this is not sufficient to carry Plaintiff's burden:

> Temporal proximity alone, however, is insufficient to rebut [employer's] legitimate reason for [employee's] non-selection.  If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.

*Pendleton v. Holder*, 697 F.Supp.2d 12, at 23 (D.D.C. 2010); *citing Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).  Thus, to the extent that Plaintiff's case is based on mere proximity, her case is legally insufficient to proceed to trial, and Summary Judgment in favor of LSI is appropriate.

### 2.  Plaintiff has opinions, but no facts, which contradict LSI's legitimate non-discriminatory reason for her termination

As discussed above, Plaintiff does not have any direct evidence that she was terminated due to her pregnancy, aside from mere proximity.  Each time she was asked during her deposition why she believes she was discriminated against, Plaintiff delivered a well-rehearsed laundry list of "reasons" which will be addressed hereinbelow.  These "reasons," however, are nothing more than opinions held by Plaintiff, based on either pure speculation or incomplete data.  In fact, Plaintiff's name was on a list of potential terminations before she notified LSI of her pregnancy.

An employee's deep-seated convictions, unsupported by any specific facts contained in the record, cannot create a question of material fact as to the legitimacy of an employer's actions.  "As courts are not free to second-guess an employer's business judgment," a plaintiff's mere speculation is "insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment."  *Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) (*quoting Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

24

Accordingly, if Plaintiff "is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

All of Plaintiff's "reasons" for why LSI's termination was discriminatory are mere speculation. Each of the "reasons" she has offered will be addressed herein under the *Brady* analysis, and it will be demonstrated that Plaintiff has failed to satisfy her burden of producing evidence to show that the legitimate non-discriminatory explanation offered by LSI "was not the actual reason and that the employer intentionally discriminated against the employee." *Brady*, 520 F.3d at 494. Plaintiff's list of "reasons," as articulated through the discovery phase in this case, consist of the following factors:

> a. *That Plaintiff was a self-assessed "top performer" (Gross Dep. 17:17-18; 18:1-2; 21:14-18) and was replaced by someone who was at the company less time and thus had less experience (Gross Dep. 18:16-22; 186:3-9; 190:7-10); (Plaintiff's Answers to Interrogatories, No. 3).*

Each time Plaintiff has been asked why she believes she was discriminated against, Plaintiff's response included the "reasons" that she was a 'top performer' and that Meyer had 'less experience' than her. While Plaintiff may have actually believed these to be true, that is insufficient to demonstrate that the legitimate non-discriminatory reason proffered by LSI is merely pretext.

First, Plaintiff cannot prove pretext based upon her own subjective assessment of her performance:

> [A] plaintiff cannot satisfy her burden of demonstrating pretext simply based on her own subjective assessment of her own performance. A plaintiff has the duty to put forth evidence of discrimination, not to quibble about the candidates' relative qualifications. In the absence of any other evidence that would allow a jury to infer that discrimination took place, slight questions of comparative qualifications do not warrant a jury trial.

*Chappell-Johnson v. Bair*, 574 F.Supp.2d 87, 101 (D.D.C. 2008) (*citing Hammond v. Chao*, 383 F.Supp.2d 47, 57 (D.D.C. 2005)).  Plaintiff acknowledged that LSI never referred to her as a "top performer," but rather, that was a term that Plaintiff herself used to describe her own performance.  (Gross Dep. 21:14-18).

Second, in her deposition testimony, Plaintiff acknowledged that she and her alleged "replacement," Kathy Meyer, were comparably qualified.  Specifically, Plaintiff described Meyer's experience as being similar to Plaintiff:  "[w]e basically have, I would say, similar experience.  We were at jobs for similar amounts of time."  (Gross Dep. 108:8-10).  Further, Plaintiff acknowledged that she was unaware of Meyer's education background, (*Id.* at 11-13), which included a Masters Degree in Human Resource Management, something that Plaintiff does not have.  Lastly, Meyer was the far more experienced and successful recruiter, which was an important consideration for LSI.

Accordingly, based upon a comparison of the relative qualifications of Plaintiff and Meyer. Plaintiff will be unable to meet her burden of producing evidence that LSI's stated explanations for terminating her employment were mere pretext.

> b. *That Plaintiff was replaced by someone who was not pregnant.  (Gross Dep. 18:20-21; 19:8-9; 186:7-8; 188:10-11).*

First, contrary to Plaintiff's assertions, was not 'replaced' by anyone.  LSI did not hire a new employee to fill Plaintiff's job.  Instead, another employee – who was already with the company, and who performed recruiting duties which Plaintiff did not – subsumed Plaintiff's job duties after Plaintiff was terminated.  It seems to defy challenge that it is easier for a full-time employee to subsume the duties of a part-time employee, rather than the other way around.  In addition, there were recruiting concerns that LSI considered in deciding between Plaintiff and Meyer.

Furthermore, this fact alone cannot be considered as evidence of discrimination.  To argue otherwise would be to re-write the law in this jurisdiction, and to accept a *prima facie* case, alone, as sufficient to carry a Plaintiff's burden of proof at trial.  It would essentially turn an anti-discrimination law into a strict-liability standard, whereby employers could never terminate a pregnant employee unless replacing her with another pregnant employee.

      c.   *That Plaintiff was replaced by someone making more money.  (Gross Dep. 17:21; 18:13-15; 19:19-20:3; 186:8); (Plaintiff's Answers to Interrogatories, No. 3).*

First, as stated above, Plaintiff was not replaced. But Plaintiff's claim that her 'replacement' made more money than she did is misleading at best.  In forming this argument, Plaintiff is only comparing the *gross* salary figure paid to her and Meyer, and on that basis Meyer did earn more money.  However, on an hourly basis, Meyer was not paid a higher hourly rate than was Plaintiff.  Plaintiff fails to account for the difference in hours worked, and the hours required by the HR needs of LSI.

Furthermore, this "argument" fails to reflect the reality of LSI's HR department.  Plaintiff, alone, was not capable of fulfilling all of LSI's HR needs (e.g., recruiting), especially given her inability to travel, part-time schedule.  As such, LSI did not have a viable option of terminating Meyer and retaining only the Plaintiff, without sacrificing performance of the HR department, including the recruiting function.  And if, then, Meyer had to be retained, or additional help brought in to assist Plaintiff, then there is no cost savings from terminating Meyer.  However, given that Meyer could subsume the work duties performed by Plaintiff without needing additional help, there was a cost savings in terminating plaintiff.

The reality is, Meyer and Plaintiff were duplicative, but Plaintiff could not fulfill all of the HR needs of LSI by herself, whereas Meyer could.  As described herein, LSI realized that

Meyer could subsume Plaintiff's job duties, whereas Plaintiff could not subsume Meyer's job duties.  That consideration alone makes the business decision fairly straightforward.

> d. *That Plaintiff believes it was unlikely for LSI to implement financial cutbacks. (Gross Dep. 19:16-20:9; 188:12-17); (Plaintiff's Answers to Interrogatories, No. 3).*

Plaintiff repeatedly explained that in her view, and from her (admittedly limited) understanding of the operations of the business, that it seemed unlikely that LSI would actually need to implement cost reduction measures.  Plaintiff primarily based her opinion on various press releases that LSI issued, and posted on its website, describing various contract wins by LSI. When pressed, however, Plaintiff admits she was unaware of any revenue coming from any of those contract wins, that she was unaware of any profit coming from any of those contract wins, and that she was unaware of LSI hiring any employees to staff or work on any of those contract wins. (Gross Dep. 305:2-18; 307:9 – 308:4; 308:16 – 309:10).

Plaintiff was asked if she understood the difference between gross revenue and net profit. Plaintiff responded that she did understand the difference in concepts, on an individual level. Specifically, she was asked:

> Q:  On a corporate level, like Logistics Support, do you know what factors go into that calculation, gross revenue leading to net profit?
>
> A:  No, I am not aware of that.

(Gross Dep. 311:16-19).  She went on to testify that she never reviewed or contributed to the company's income statements.  (Gross. Dep. 313:3-8).  Plaintiff acknowledged that a company newsletter published in Summer 2010 stated that management was working to identify methods to reduce costs and improve profitability, but that she was not aware of what methods were being considered by management.  (Gross. Dep. 316:11-317:6).

With respect to the decision to terminate employees as a method of reducing LSI's operating costs, Plaintiff acknowledged that she was not involved in the discussions by LSI management regarding terminating employees to reduce overhead costs. (Gross Dep. 188:2-5). As such, she has no direct knowledge of what factors were considered and discussed, or of what options were explored.  During her deposition, she did testify about fluctuations in the size of LSI's workforce.  When asked about why the number of employees would go down, the following exchange took place:

> Q:     Why would we let people go?
> A:     There is no work, then; there is no other contract to put
>         someone on.
> Q:     And it didn't make financial sense to keep them?
> A:     Correct, or whatever the reason was.

(Gross Dep. 312:10-15).  Thus, Plaintiff knew that LSI had, in the past, let employees go when it did not make financial sense to keep them on.  Her claim that LSI's legitimate non-discriminatory reason for terminating her does not make financial sense, or is somehow contrived, is hollow and unfounded.

> e.   *That Plaintiff believes LSI's downsizing does not conform to her opinion of what 'best practices' are in a layoff situation. (Gross Dep. 19:10-15; 189:3-10); (Plaintiff's Answers to Interrogatories, No. 3).*

Plaintiff testified in her deposition, and asserted in her answers to interrogatories, that LSI's decision to lay her off does not comply with Plaintiff's personal understanding of industry "best practices" for conducting layoffs.  Plaintiff believes the proper way to conduct a layoff requires an employer to first terminate newer employees, and/or employees earning higher salaries.  Plaintiff has identified no expert witnesses to support her views on these so-called "best practices," but instead bases this claim on her own prior HR experience.  However, as Plaintiff testified in her deposition, the entirety of Plaintiff's experience with layoffs consists of having participated in just a single previous layoff, at a company she was employed at over a decade

ago. (Gross Dep. 191:13-17).  Based on this limited experience, Plaintiff believes that LSI should have terminated Meyer instead of Plaintiff, and that LSI's failure to conduct a layoff in this precise fashion constitutes evidence of pregnancy discrimination.

Plaintiff ignores several important facts relevant to this inquiry.  Plaintiff ignores the fact that Meyer was able to work full-time.  Plaintiff ignores the fact that LSI's opinion was that Meyer was significantly better at recruiting than Plaintiff.  Plaintiff ignores the fact that Meyer was available for work travel whereas Plaintiff was not.  Plaintiff ignores the fact that Meyer earned a Masters degree in Human Resource Management, which Plaintiff did not earn.  Plaintiff ignores the fact that LSI had previously offered Plaintiff's position to Meyer, who turned it down and thus it was ultimately offered to Plaintiff.

Instead, Plaintiff's argument appears to be that, based on her own (limited) understanding of undefined, non-binding, industry "best practices," LSI should have terminated Meyer instead of Plaintiff, and that LSI's failure to comply with Plaintiff's opinion on how to conduct a layoff is evidence from which a reasonable jury could conclude LSI discriminated against Plaintiff based on her pregnancy.

### C.  There is Independent Evidence That Supports LSI's Position That Plaintiff was Terminated For a Legitimate Non-Discriminatory Reason

Not only has Plaintiff failed to identify any evidence of discrimination by LSI, but the evidence actually undermines her arguments.  The record herein contains ample evidence that LSI had a family-friendly culture, and that it did not discriminate against its employees, contrary to Plaintiff's thin assertions.

For starters, Plaintiff is unaware of any employees being fired by LSI for being pregnant. (Gross Dep. 194:9-12).  Additionally, Plaintiff was regularly involved in the hiring of pregnant employees, and in processing maternity and paternity leave for existing LSI employees.  Despite Plaintiff's involvement in the hiring process, Plaintiff claims she was unaware that, in the same

month as she was terminated, LSI knowingly hired a woman who was pregnant at the time of her hire (and who, in fact, gave birth prior to her start date, which then had to be postponed).  (Gross Dep. 194:13 – 196:9).  LSI also published a regular company newsletter which often included announcements about the anniversaries and pregnancies / births of company employees.  (Gross Dep. 207:20 – 208:1).

Plaintiff herself benefitted from LSI's family-friendly culture each time that she needed to take time off from work to be home with her young daughter, as LSI was supportive of her personal needs. (Gross Dep. 200:4-13; 202:20 – 203:7).  Further, Plaintiff made it clear to LSI from the very beginning of her employment that she intended to have additional pregnancies in the future. (MacDonald Dep. 208:12-22).  Plaintiff's growing family and her intention to have additional children was of absolutely no concern to LSI, and played no part in LSI's decision on whether or not to hire or fire her for the position of HR Manager.  (MacDonald Dep. 209:1-8).

Finally, there were material job-related differences between Plaintiff and Meyer, as described and discussed hereinabove.  Most notably, Meyer was able to work full time, was able to travel for work, had a Masters Degree, and was a better recruiter.  Each of these factors was important to LSI, and constitute material differences between Plaintiff and Meyer, and which were considered by the executive team in its deliberations.  Finally, Meyer was still female, and LSI had no reason to believe that she was not pregnant, or would not become pregnant in the future.  In fact, shortly after starting her employment with LSI, Meyer married, and a family may be in her near future.  If LSI *were* discriminating against Plaintiff for becoming pregnant, it seems unlikely they would "replace" Plaintiff with another woman.

V.    **CONCLUSION**

As discussed herein, this case involves simply no credible evidence of any discrimination by LSI against Plaintiff.  The only "reasons" Plaintiff can assert to support her naked assertions

of discrimination are her own beliefs and assessments, coupled with assumptions and opinions

which are based on incomplete or non-existent data, to reach the conclusion that the only

possible reason she could have been terminated was discrimination against her due to her

pregnancy.  Fortunately for LSI, the law in this District requires the Plaintiff to be able to adduce

actual evidence in support of claims such as hers in order to proceed to trial.

Since Plaintiff has presented no credible evidence sufficient to convince a reasonable jury

to find that LSI wrongfully discriminated against her, LSI respectfully requests that this Motion

for Summary Judgment be granted, and this cause be dismissed with prejudice.


May 17, 2013                                 **LOGISTICS SUPPORT, INC.**
                                             By Counsel:



                          _____**/s/ James A. Allen**_____
                          James A. Allen (DC Bar # 443595)
                          GENERAL COUNSEL, P.C.
                          6862 Elm Street, Suite 800
                          McLean, Virginia 22101
                          Phone: (703) 556-0411
                          Facsimile: (703) 556-6540
                          jallen@GCPC.com
                          Counsel of Record for Logistics Support, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**ELLEN F. GROSS,**                         )
                                            )
                    PLAINTIFF,              )
                                            )
        **v.**                              )        **Civil Action No. 1:12-CV-1531**
                                            )
**LOGISTICS SUPPORT, INC**.,                )
                                            )
                    DEFENDANT.              )
_____)

**DEFENDANT LOGISTICS SUPPORT, INC.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Logistics Support, Inc., by counsel, in support of its Motion

for Summary Judgment and pursuant to Rule 7(h)(1) of the Local Rules of the District Court of

the District of Columbia, and in addition to its accompanying Memorandum of Points and

Authorities in Support of its Motion for Summary Judgment, submits the following a statement

of material facts as to which Defendant Logistics Support, Inc. ("LSI") contends there is no

genuine dispute:

**Undisputed Material Facts**

1. In 2009, LSI lost two major contracts, causing a substantial loss in revenue and a
   reduction of its total work force by more than 100 employees. (MacDonald Dep. 193:1-
   21); (Compton Dep. 28:1-22 – 29:1-11).

2. In 2010, LSI's financial situation had not fully recovered, and the company's overall
   revenue was down. (MacDonald Dep. 69:10-17; 106:17-18; 157:19-22 – 158:1-5; Ex. 27,
   at pg. 8).

3. 2010 was the first year in which LSI's history in which its total revenue did not increase.
   (MacDonald Dep. 158:4-5).

4. During the first half of 2011, LSI's revenue had stalled, its business pipeline had slowed,
   and the company was not meeting its financial projections. (Compton Dep. 78:13-22 –
   79:1-5; 89:2-12; 141:5-15; 144:1-16); (MacDonald Dep. 70:14-22 – 71:1-5).

5. As a result of LSI's decline in revenue in 2010 and its stalled business development in 2011, during the first half of 2011 the core concerns of LSI's executives were reducing costs and increasing business development. (Compton Dep. 29:12-22 – 30:1-4, 158:8-11); (MacDonald Dep. 69:4-17; 70:14-22 – 71:1-5).

6. In 2011, LSI moved its office from Washington, D.C. to Arlington, Virginia as a cost-cutting measure to reduce operating expenses and to offset the cost of its investment in new business development initiatives. (Gross' Responses to Requests for Admission, No. 12); (Gross Dep. 161:13-22); (MacDonald Dep. 70:14-20); (Compton Dep. Ex. 4).

7. In 2011, LSI decided to downsize its General & Administrative ("G&A") personnel as a cost-cutting measure to reduce operating expenses and to offset the cost of its investment in new business development initiatives (MacDonald Dep. 71:17-22 – 72:1-3; 99:14 – 104:1); (Compton Dep. 67:1-9; 85:12 – 87:18; 89:2 – 92:11; 93:18 – 95:13; 98:12 – 103:7; Ex. 4, 5).

8. During an April 2011 executive meeting, LSI's executive team identified a list of eight G&A employees, including Plaintiff, who were possibilities for termination as part of the downsizing of its G&A personnel. (Compton Dep. 86:4-17; Ex. 4); (MacDonald Dep. 71:6-22 – 72:1-20; 83:3-20; 192:4-17); (LSI's Answers to Interrogatories, No. 7).

9. On June 22, 2011, LSI terminated three of its G&A employees, including Plaintiff. (Gross Dep. 173:4-8); (MacDonald Dep. 85:16-20).

10. The June 22, 2011 terminations were part of a cost-cutting measure by LSI in order to reduce its operating costs. (Compton Dep. Ex. 2); (MacDonald Dep. 111:7-22; 184:22 – 185:17).

11. LSI's improved financial performance by the close of 2011 was attributable to the cost-cutting measures it had implemented in the first half of that year. (MacDonald Dep. 177:17-22 – 178:1-11).

12. Plaintiff has no knowledge of LSI's financial condition during the end of 2010 and the beginning of 2011. (Gross Dep. 164:4-9).

13. While employed by LSI, Plaintiff was a part-time employee who worked three days a week at eight hours per a day, or 24 hours per a week total. (Compton Dep. 45:16-22).

14. While employed by LSI, Plaintiff made it clear to LSI's management that she wanted to work part-time. (Gross Dep. 39:18-20); (Gross' Responses to Requests for Admission, No. 23); (Compton Dep. 203:11-15).

15. Plaintiff never indicated to LSI that she would be willing to work full-time. (Gross Dep. 39:18-22 – 40:1-9; 194:3-5); (Gross' Responses to Requests for Admission, No. 24); (MacDonald Dep. 87:19-22 – 88:1-17).

16. Meyer's position with LSI was a full-time position. (Gross Dep. 73:15-17); (Meyer Dep. 37:14-15).

17. LSI had never had any complaints or concerns regarding Meyer's employee performance. (MacDonald Dep. 197:6-8); (Gross Dep. 81:17-19).

18. There is no evidence that, during Plaintiff's employment with LSI, any of LSI's executive team ever discussed, mentioned, or referred to Plaintiff's pregnancy, other than by responding with "congratulations" when Plaintiff informed them she was pregnant. (Gross Dep. 165:2-22; 166:1-21; 167:16-21; 168:5-22 – 169:1-18); (Compton Dep. 62:2-20; 196:19-22 – 197:1); (MacDonald Dep. 68:8-22 – 69:1-3).

19. Prior to her termination, Plaintiff believed LSI to be a family-friendly focused company. (Gross Dep. 165:9-13).

20. Other than herself, Plaintiff is unaware of any employees who have alleged that LSI unlawfully discriminated against them. (Gross Dep. 242:17-22).

21. Plaintiff has no knowledge of LSI ever opposing an employee taking leave under the Family Medical Leave Act. (Gross Dep. 197:5-8).

22. At the time that LSI made the decision to hire Plaintiff, LSI was aware that Plaintiff had a three-month old child. (Gross Dep. 199:18-22 – 200:1-3); (MacDonald Dep. 208:12-22 – 209:1-4).

23. While she was employed by LSI, LSI was supportive of Plaintiff whenever any issues arose with her daughter's care that Plaintiff needed to attend to. (Gross Dep. 200:10-13; Ex. 29).

24. In the same month that Plaintiff was terminated, LSI hired a new employee who was nine months pregnant (Gross Dep. Ex. 24), and when that employee gave birth before her start date, LSI accommodated her by giving her a new start date instead. (Gross Dep. Ex. 25).

25. Meyer was a qualified and capable human resources manager. (Gross Dep. 212:5-12); (Compton Dep. 202:15-18); (MacDonald Dep. 116:2-14).

26. Meyer possessed a Masters Degree in Human Resources Management. (Meyer Dep. 15:6-7)

27. In 2007, LSI made an employment offer to Meyer for the position of HR Manager, but Meyer did not accept the offer. (Compton 186:13-16); (Meyer Dep. 33:2-15).

28. At the time of Plaintiff's termination, Plaintiff and Meyer had similar experience as human resources professionals, had held similar human resources jobs for similar amounts of time, and had similar professional training in human resources. (Gross Dep. 108:6-10; 212:3-10; 212:20-22).

29. During the period of time in which both Plaintiff and Meyer were employed by LSI, Meyer's hourly rate was less than or equal to Plaintiff's hourly rate. (Gross' Responses to Requests for Admission, No. 23).

30. During the period of time in which both Plaintiff and Meyer were employed by LSI, Plaintiff would ask for advice and assistance from Meyer on how to handle HR issues. (Gross Dep. 217:18-22 – 218:1-2).

31. During the period of time in which both Plaintiff and Meyer were employed by LSI, Meyer routinely handled HR issues for LSI and for LSI's employees. (Gross Dep. 213:10 –215:8; 221:20-22 – 222:1-4; Ex. 13, 32, 33).

32. Plaintiff did not provide any transition assistance to Meyer after Plaintiff's termination. (Gross Dep. 185:13-22).


May 17, 2013                          **LOGISTICS SUPPORT, INC.**
                                     By Counsel:


                                     _____*/s/ James A. Allen*_____
                                     James A. Allen (DC Bar # 443595)
                                     GENERAL COUNSEL, P.C.
                                     6862 Elm Street, Suite 800
                                     McLean, Virginia 22101
                                     Phone: (703) 556-0411
                                     Facsimile: (703) 556-6540
                                     jallen@GCPC.com
                                     Counsel of Record for Logistics Support, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 17, 2013, I will electronically file the foregoing Defendant's Motion

for Summary Judgment, Memorandum in Support of Defendant's Motion for Summary

Judgment, and Statement of Undisputed Material Facts with the Clerk of Court using the

CM/ECF system, which will then send a notification of such filing to the following:

**Brian A. Scotti**
CHARLSON BREDEHOFT COHEN BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Fax
bscotti@cbcblaw.com

**Peter C. Cohen**
CHARLSON BREDEHOFT COHEN BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Fax
pcohen@cbcblaw.com

Counsel for Plaintiff Gross


                                               **/s/ James A. Allen**
                                          James A. Allen (DC Bar # 443595)
                                          GENERAL COUNSEL, P.C.
                                          6862 Elm Street, Suite 800
                                          McLean, Virginia 22101
                                          Phone: (703) 556-0411
                                          Facsimile: (703) 556-6540
                                          jallen@GCPC.com
                                          Counsel for Defendant Logistics Support, Inc.